v. Attaway, and we have Mr. Edward Kiyonka here for the appellant, and we have Mr. James Hanks for the appellee. You may proceed, Mr. Kiyonka. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, I am Edward Kiyonka, and I represent Penny Attaway. This is the appeal from the final judgment in a marginal dissolution case that began over seven years ago. Today, the only remaining issues are certain property matters, specifically whether the trial court abused its discretion in classifying certain property as marital or non-marital, or omitting certain property from the division, and whether the trial court's finding of dissipation is contrary to the manifest weight of the evidence. Edwards is cross-appealed, claiming that the trial court did not give sufficient weight to dissipation in the property division. Both parties have challenged the fairness of that division. A careful examination of the evidence will be required to resolve most or all of these issues. The record in this case is large. The evidence is scattered among 18 volumes of hearings and a large number of exhibits. Clearly, we don't have time in this brief argument this morning to dissect the evidentiary issues concerning the classification of property as marital or non-marital or omitted. In our brief, we have provided the Court detailed analyses with citations to the record, and so on most of these issues we will necessarily have to defer to our briefs. I will be happy to answer questions about any issue, but I would like to focus this morning's argument on point one, the alleged dissipation of marital assets. We recognize, Your Honors, that once a party has made a prima facie showing of dissipation, the party charged with that dissipation has to show by clear and convincing evidence how marital funds were spent. But in this case, Your Honors, Edwards did not make that prima facie showing. In its findings and judgment order, the trial court adopted Edwards' argument that Attaway dissipated marital assets, which Edwards adds up to be $580,000. As we have shown in our brief, this is simply impossible on its face. Edwards argues that the trial court adopted this figure, but as we show in our reply brief, the trial court only states that Attaway dissipated marital assets in the manner stated in Edwards' argument. The trial court's actual finding as to the dollar amount was, and I quote, the dissipation I found was the dissipation from checks written from Medical Services Unlimited. It was $234,000 of checks written from that account in a six-month period. Let me ask a question. Did the trial court use that $234,000 figure? Did the trial court use that figure, $234,000, or did the trial court just say, we're talking about checks written? No, the trial court used that as an actual quote. The trial court actually used that figure. Now, that figure does not appear in the judgment, but we'll talk about that later, of course. But the trial court, the court actually used that figure. And that was on a post-trial motion. That was in hearings following the findings. It really wasn't a post-trial motion, Aaron, because there had been no judgment. The trial court filed a memorandum in which the court stated its findings and its ruling, and then both parties filed motions to reconsider. And so there were subsequent hearings, and it was during those hearings that it was discussed, but there was actually no judgment until the final judgment in this case, which was entered March 17, 2010. But even that figure, $234,000, is contrary to the manifest way to the other. Edwards failed to make a promulgation showing of what part of the money he claims was dissipated was actually expended. Some of it was transferred to another account, and as to any actual expenditures, what part of it had a source in marital funds. Edwards also included in his argument expenditures that would not constitute dissipation, even if they had been made from marital funds. So having not made a promulgation showing the burden of rebuttal on this issue never shifted to Attaway. First, most or all of the money he claims was dissipated could not have been marital property. The parties kept separate bank accounts and segregated their funds as much as possible. Attaway's earnings from her practice, which was the source of the marital funds, during the relevant time were deposited in her MSU checking account at South Point Bank. This was the only possible source of marital funds that could constitute dissipation. During the time period in which the trial court found dissipation, which was January 2004 to July 2004, the court is explicit about that also, the money claimed to have been dissipated had to have come either from Attaway's South Point checking account, her business checking account, which was marital property, or her individual Smith Barney investment account, which was not marital property. Now, according to her 2003 and 2004 federal income tax returns, Exhibits 11 and 12, Attaway's net income from her practice was $60,000 plus in 2003 and $41,000 plus in 2004. $234,000 would not have come out of that income. Mr. Kiyanka, was there a dispute over whether that could have been the only source, was her income from her practice? The evidence does not show any other possible source, assuming, as the evidence I think showed clearly, that her Smith Barney investment account was her separate non-marital property. And we've traced that in the record, Your Honor. The money in that Smith Barney investment account came from, first of all, sales of two houses that she owned prior to the marriage, which she then deposited in the savings account and then moved that into the other account. And there's no doubt that that money, therefore, would change its character. She did not mingle that money with marital money. And there does not appear in the record to be any other possible source of marital funds which could have been included in a figure of dissipation. Most of the funds, as we've shown in the record, most of the funds that were claimed to be dissipation were spent on the Woodlawn property, improvements to that property and repairs and rehabilitation and so forth with respect to that property and other assets and expenditures. And Counsel for Edwards, in the record, went through a number of checks. And we have included in our brief a chart of at least some of those checks, at least those to be identified as to what they, from the record, as to what they were for. Those checks are in the record also. And we've shown that a large part of that money simply could not be classified as dissipation. The trial court said it found dissipation based solely on the checks written on the MSU South Point Checking Account during that six-month period. Some of those funds went to the on that project. That simply could not have come out of the MSU checking account. Many of the checks also, if you look at the record, many of the checks written on the South Point Checking Account were for items that could not possibly be dissipation. Even to the extent that some of the MSU money was spent on the Woodlawn property, some of these expenses, expenditures obviously increased the value of that property, which the trial court classified as merit. Increased the value of that property because the original purchase price, which by the way that property was purchased by Attaway prior to the marriage, so it was non-merit property, to begin with at least. And it was purchased for $120,000. It was valued at the time of the over $100,000 increase in the value of the property. So the money that was extended, even if you consider that some of that $200,000 that was spent did not increase the value of the property, some of it did. Some part of it did increase. And that would not constitute dissipation either. In addition, during that time, her financial affidavit showed that she had a negative balance every month. She was responsible for the vehicle payments, credit cards, attorney's fees, all household expenses, marital bills after the party separation. During this period she also paid bills on the Centralia Lake home. She paid the mortgage on the Woodlawn property because Edwards quit making the payments. The payment of usual and necessary living expenses is not dissipation. None of those could be classified as dissipation. The other dissipations, he claims, were not dissipation. They were proper living expenses or family expenditures consistent with the family's previous lifestyle. For example, purchase of a horse trailer, lease of a pickup truck, or payments to the family's IRAs. The transfers to IRAs would not be dissipation because that's transferred to another asset. And those IRAs that were not cashed in and spent during the period between the breakup and the actual dissolution judgment went into the IRAs and those IRAs, the children's IRAs, were eventually cashed and used for living expenses and college expenses. The party's IRAs are in the judgment. So that any money put in those IRAs wouldn't have to do dissipation because it's in the budget. In other words, Your Honor, as to the vast majority of the money that the record shows was spent or transferred by Attaway during the voluntary period, which the trial court said was January to July 2004, Edwards did not make a primary basis showing dissipation, at least as to the vast majority of that money. It's because either the money had to have been for separate nominal property, there wasn't enough other income, or the money resulted in or enhanced a marital asset that was allocated in the judgment, or the money was spent for a proper marital purpose or for reasonable living expenses. So the finding of dissipation was erroneous and the property division, which was based on that finding, therefore, has to be erroneous also and must be reversed. Finally, Your Honor, the property division itself, in light of the erroneous dissipation finding, is inevitable. Attaway came into the marriage with three debt-free homes that she alone paid for and substantial cash assets. She sold the two out-of-state homes and transferred the money into her separate non-marital savings accounts. During the marriage, she owned a business that earned between $33,000 and $60,000 a year, and she had substantial capital gains in her investment account, which at one time was worth as much as $400,000. Edwards brought minimal assets, net assets, into the marriage, and during the marriage, she earned between $20,000 and $32,000 from several sources. The vast majority of family expenses during the marriage came from Attaway's earnings and non-marital property, and this greater contribution to the acquisition and maintenance of the party's property justifies a greater share of the marital property. Given this disparity, the trial court's property division was distorted by its erroneous finding of dissipation, and therefore, for this reason alone, there must be a new property division. Let me ask a question. As I understand Mr. Hansen's brief, one of the things he argues is that a lot of your arguments are based solely on the testimony of your client, unsupported by any documentation, or at least that comes up. In some cases, that's true, Your Honor. And that the trial court simply did not believe she was credible. Yes, and that's why we've tried to focus our arguments on things that are established. We have the checks. We have the tax returns. We do have solid evidence on these matters, and that's why we're saying that if you just simply do the math and look at the tax returns and then look at the checks, you can determine that a very substantial part of that money could not have been marital funds. It is simply a deduction that has to be drawn from that evidence. Was Ms. Attaway pro se in the trial court? Yes, Your Honor. For a large part of the time, both parties had to be pro se at various times, and so she did have an attorney at some times in the trial court, but for a large part of the time, yes, she was pro se. What do you mean, had to be pro se? Well, I say had to. That's a presumption. I think the problem was it had gotten too expensive for both parties to continue to have attorneys, but I probably shouldn't say that because it's not in the record. Thank you, Mr. Bianco. You'll have the opportunity for rebuttal. Mr. Hanson? May it please the Court, I'm Jim Hanson. I represent George Edwards. It's always interesting to come on appeal. Both sides see things differently as to the nature of the animal. This Court has the record to look at. I'd like to draw your attention quickly to some statements made by the Court that was contained in my brief. After they had filed for divorce in the fall of late 2003 and early 2004, this is when that dissipation claim began with the Court, and the Court indicated that there was several transactions, an 8,300 withdrawal in January, 50,000 in April, another 50,000 in April, 66,747 in June, 35,000 in July. What's interesting is the withdrawals from where? From Smith-Barney accounts and primarily I cite the record as to exactly. I was a counsel at trial, so I'm thinking, to be fair to Mr. Kalkin, it's a voluminous record, and I agree with Mr. Kalkin that the record is the focus of whether the manifest weight arguments or the discretion is in some way improper. But I want to draw the Court's attention to that, because in the trial it became important in examination, cross-examination, where did these monies come from, what's the source of them, where did they go, and so on. A counsel makes representations of his reading of the record. I can suggest to you, and it's in my brief, that Ms. Attaway admitted that she owned one of these Smith-Barney accounts, to which this money came after. There's an argument that that came from non-marital into the, quote, theoretical marital account and back out again. But the marital money was derived from her practice? Was there any other source of the marital money? My reading of the record was that the monies involved here were primarily monies that either had been accumulated in the accounts before, to some extent, or after they were married. Now, the testimony in trial about what her income was at different times and what she earned over the years preceding or subsequent to the filing of this divorce varies. I mean, her practice was a successful practice, but perhaps in 2003 and 2004, those years, it may last, but that's the net, the netting of the taxes. I don't know what the volumes were. All I'm suggesting to the Court is that I believe Judge Long, because these are all brought up to him after the case was over, all these issues about what was or was not marital or non-marital or tracking in on accounts were contained in the court when he recalled within these motions to reconsider, and the multiple days of hearing that were had after the memorandum of his decision was held. So there was additional information in time, basically, I guess, to cure some issues, if there was some tracing arguments that were made. I believe there's a difference of opinion about what the law is with respect to the primary phase UK. Not a difference of opinion on the law, but a difference of opinion on how it applies to the facts of this case, that the monies that were there and when did the burden shift to, well, where did that money come from? How did it get there, and is it presumed to be marital? As you can clearly show, clearly show it's non-marital. These are the issues that the record is voluminous with the questions that were asked, and I tried to draw in a limitation we both have as to these things, the attention to the court where these matters were addressed in some respects. But it's obvious, and, Justice, you refer to that Judge Vaughn specifically found that there was some culpable, relatively culpable conduct in which respect to trying to conceal or hide or dissipate assets. The issue, I guess, then, is whether or not he was justified based on the record and the evidence that he heard in making that determination. In addition, you know, when I got this record and began to wade through it, I'm looking at it from the outside, which all of us do whenever we see things for the first time, and I'm looking at the facts that were presented to Judge Vaughn as I saw them, and that was a successful nurse practitioner who had high-income earning ability, or at least had manifested that in the past. They accumulated a lot of property, it's all in the record, both during the marriage and even after they separated a lot of property purchased by primarily by Miss Haddaway. My client, the carpenter, made, I think the record said, between $20,000 and $30,000 a year. Miss Haddaway made more. Whether it was $60,000 on this particular year or it could have been more than that. And so at the end of the day, the order provided for a substantially equivalent distribution of the estate, approximately 50 percent to each, after the court had made its findings as to whether the property was marital or non-marital. My argument to this court is, again, that's against the manifest way of the evidence, or that's an abuse of discretion in that my client has a substantial less earning power, and he should have had more than a 50-50, and further, that there was nothing in that 50-50 calculation that was manifest in the written order of the court or the memorandum of findings that said, and for the dissipation, I'm going to set off or award some property or some other money. Implicit in the ruling, I think, Your Honors, is that the judge, Judge Vaughn, must have said, well, in my thinking of all these things, I'm going to basically get you up to 50 percent, because I feel, based on the evidence, that's what it would be. It would be less than 50 percent absent from the dissipation. That's me just reading into, perhaps, the order of the court. The court may recall that there was a discussion at the motion to reconsider and a ruling by the judge, and basically Judge Vaughn said, and it's quoted, I think, in both of our briefs to the court, that Mr. Judge Overstreet, now Judge Overstreet, was the trial attorney for my client. He, as a side judge, as he was not involved in the motion to reconsider, he was elected to the bench and took the bench during the lead. The memorandum decision was entered on October 28th, I think, of 2008, and Judge Overstreet, I think, took the bench or maybe was on the bench at that time and didn't get to participate. So he wasn't there to argue what he intended or didn't intend, but he had submitted, and Judge Vaughn had asked him to submit to the court proposals. And in that proposal, respectfully, Judge Overstreet did not specifically say, and here's a separate money award for the dissipation or whatever. In the motion to reconsider, it was like counsel would affirm, I think it was Scott Quinn was the one who argued the final motion to reconsider. I think that's what it reflects in the record. Judge Vaughn basically said something to the effect, well, this is what you asked, this is what you asked for, and I found it that way. Respectfully, I'd certainly argue, and I'm humbled by doing it, but even if we make mistakes, if you can fix our mistakes or if we can fix your mistakes, and I say that respectfully to the court, that's the common goal, that if there's a mistake, and I'm not suggesting there was a mistake, but that's just my client's position. That issue, considering all the evidence in this case, the relative earning power of the parties, the substantial amount of assets, the finding of dissipation suggests, I believe, that my client should have received a greater distribution of the Maryland state, and that's part of my response. Much of my brief is spent, Your Honor, is responding to these various detailed arguments about specific items of classification of Maryland property. One other issue that comes up, Judge, my friend, I can't even tell you how it affects the case, but in the statement of facts, my statement of facts, there was a stipulation for entry of a bifurcated judgment early on in the case. I think it was in the fall of 2004, and in that stipulation, I could read it to the court, but basically it said even though we're stipulating the judgment, the income and property acquired until dissolution will still be considered marriage. Later on, later on. Okay, let me stop you there. Was a judgment of dissolution of marriage entered at that time? There was a judgment of dissolution entered with that language in it, Your Honor. And the language was that any property acquired from that date until all issues were resolved? Yes. Would it continue to be married? I haven't worked it out. Let me see if I can point it out to you, Your Honors. Sorry about that. Basically, what I put, what the appellate that put in there is similar. It says the judgment provided, quote, Appellate is found to have voluntarily waived the claim to assert a non-marital character for income earned or property acquired after this dissolution of marriage but prior to the final judgment disposing of all issues. And then it goes on to say all other issues are reserved. That is somewhat perplexing to me because later on Judge Vaughn says, no, I don't think I can do that. In other words, I can't remember the exact words, but there's a body of law that says that's a date. So he cut it off when the judgment was made. Apparently that's what he said. I don't even know how to argue it before you, Your Honors, only to the extent that if that was wrong, and I understand if they're wrong or not. This is a stipulation. This is an agreement of the parties. And it's almost as if, but you can't agree to that. You can't agree to that because case law says you can't. I raise that issue only because that's one other factor in the decision this Court has to make. To determine whether my arguments are more persuasive or Mr. Cownie's. For the record, the support argument is probably better, yeah. With that being said. So seven years of litigation and both sides want to go back and do it again. No, I hope we don't. What I am hoping, Your Honors, is that this, you know, I'm not being a judge. I'm not saying you have to make these hard decisions. You've got a lot of information that Judge Vaughn had to wade through to determine what he did. But I think it's clear that he found the credibility issue to be important to him and to make those statements. As to whether or not, as to whether or not the remaining evidence is supportive or the inferences that could be drawn probably more likely than not are supportive. It is my hope that the Court sees it the way I see it and finds there's nothing said about the dissipation, specific application of dissipation of money, and because of the spirit and earning power of the parties. But this is somewhat of an offensive appeal and also somewhat of an offensive appeal, and I say that with candor, Your Honors. Any questions, Your Honors? No, thank you for your argument, Mr. Hanson. Mr. Kiyanka, you have rebuttal opportunity. Yes, thank you, Your Honor. After that stipulation point, I agree with Mr. Hanson. The record is somewhat ambiguous on this. It's not clear whether that stipulation actually had any effect later on. But I think in looking at the issues that we have raised and discussed, I don't think it really makes any difference. I don't think that as to what we're arguing, there's no particular cutoff point at which we're saying, well, therefore, anything she may have to say was not heard. As to the withdrawals from the Smith party account, I think we should mention there's some confusion here because there were multiple Smith Barney accounts, and I think that that led to some confusion in the trial court as well. But I think the record will clearly show that there are no marital funds went into her Smith Barney investment account, and the account that we're talking about is her Smith Barney investment account. Will that be clear from the record? I believe it is, Your Honor. I believe we have all the Smith Barney statements in the record, and we have testimony explaining those statements. And without trying to go through them in detail here, I believe the record will show that money was not – the only marital earnings that she could have had would be her earnings from her practice. And I think the record will show none of that went into her Smith Barney investment account. Some of it may have – some of it did go into other accounts because there were IRAs that were family IRAs, and money went into that. But I think the record is clear that none of the marital funds that she earned during the marriage went into her separate Smith Barney investment account. Therefore, it retained its character as non-marital property, and I think that's the main point here. Now, it may well be that if you add up the money that came out of her South Point account, it would be more than the net earnings because some of that went to taxes, and some of it was taken out to go to taxes. Some went to IRAs. Some of it went for tax-deductible items. So that, of course, would mean that the checks might go more than the net earnings. But the net earnings are the marital earnings. The amount that went to business expenses or IRAs and things would clearly not be dissipation. Finally, Your Honor, as to the point that the trial court did not adequately take dissipation into account in the distribution, we have dealt with this in our reply brief, and the simple fact is they got what they asked for. Judge Vaughn, in his judgment, he says, which mirrors the findings that he made almost two years earlier, due to the reasons set forth above, that is, the dissipation findings, the court accepts the recommendations set forth by Petitioner in his written closing argument. And the written closing argument had a suggested disposition attached to it, and when this was raised by Mr. Edwards' attorney at one of the post-findings hearings, he said, I gave you what you asked for. I thought that you asked for these properties. You asked for the Central Union Private Estates and the Missouri property to offset the dissipation. And as we pointed out in our brief, and as Judge Vaughn very clearly said, it's not the court's job, this is the court, to go back and redo the job for the attorney and say, well, he should have asked for this and he should have asked for that, but he didn't. He explained to Edwards' attorney that the failure to ask for something he should have asked for is not a basis for a motion to reconsider. And as we've shown in our brief, a party who has induced the trial court to make a particular ruling or acquiesced in any request that it has made cannot assign that ruling as error on appeal. Thank you, Your Honor. Thank you, Mr. Kiyanka. Mr. Hanson, for your briefs and arguments. I won't take the matter under advisement.